Good morning, Your Honors. May it please the Court. My name is David Bennett, and I represent the appellant and patent owner in this case, PARALLEL NETWORKS, along with me at the table I have Randall Gartiza and Christopher Honea. What I would like to do is begin my argument by focusing the Court on the claim construction issue, which was the basis for summary judgment by the District Court, which has to do with the dynamically generated terms. We use that phrase in the brief to shorten it because they're kind of lengthy. They're used in both Claim 1 and 17. Claim 1 is a system claim. Claim 17 is a method claim. But for the most part, the arguments with respect to each of those terms is the same. There's no dispute that this should be the plain meaning of these terms, and I think it's important to begin the construction by looking at the claim language itself. Because what the District Court and the defendants are asking this Court to do is to narrowly construe the dynamically generated terms. And if you look at Claim 1, and we start with Claim 1, it's actually written very broadly. It's a data processing system, and this is in Column 17. The claim starts at Line 48. And you have a server, which is in Line 49, an executable applet, a constituent system associated with the applet, and a further constituent system associated with the applet. You'll notice that it doesn't say that the applet comprises those constituent systems. It also doesn't say that the constituent systems are a portion of the applet. And what's important here is that the patentee knew that if that's what they wanted, they could put that in there. Because if you turn to Claim 27, which is not at issue in this case, in Column 20, Round Line 17, it says, an executable applet dynamically generated by the server system comprising a first portion and a second portion. So when you look at Claim 1, it says, sorry, constituent systems associated with the applet. And in Claim 20, it says, you have an executable applet comprising two portions. This just follows straight from the specification. If you turn to Column 11 of the specification, starting at Round Line 8, it says, as discussed previously, because of the unique construction of the applet, the applet comprises both a data manipulation system and a data storage system, which are each constituent systems associated with the applet. And it continues. The data manipulation system may also comprise a portion of the applet. And similarly, the data storage system may also comprise a portion of the applet. So there's a clear distinction between a constituent system associated with the applet and comprising a portion of the applet. What the defendants have asked for and what the District Court found was that the applet, that to generate the applet, it must be constructed at the server by combining. And that's inconsistent if you look at claim differentiation, if you look at the specification. And what they do is they point you to Figure 2 in the pack. Now, Figure 2 is interesting because this actually has nothing to do with the generation at the server. If you look at Figure 2, the biggest box is the client device. And on that client device, you have memory. That's the next biggest box. And inside that, you have an applet, you have the data manipulation system, and the data items. This is just how it looks once it is sent to the, received by the client device. It's sitting in memory and being run. There is no dispute in this case, none whatsoever, that the applet cannot be executed until both constituent systems are on the client device. That wasn't disputed. It was raised in summary judgment by parallel networks saying it wasn't disputed. It's never been sitting in memory as constituent systems of the applet has nothing to do with how it's actually generated. And if you look at the Figure 1 and Figure 2, you'll notice that the client is actually connected to two things, the network, which has data, and the web server application or the server. So the client device can actually get information from both things. There's nothing here in the with the two constituent systems being combined at the server before it is sent to the client device. Now, and it's also important to note that combining it at the server is not a point of distinction over the prior art. In the prior art, as discussed in the patent, it discusses applets that are a single file. So whether it's a single file, multiple files, sent in one file, sent in two files, sent in three files, is not a point of distinction for this patent. It's not relevant to claim construction and it's not found in the claims themselves. Now, they also point to the fact that the claim actually says that it is constructed, it is generated. What is the, on the point that you just touched on, the reference to the prior art in the patent, if your claim construction is correct, how is your, in what respects does your invention differ from the Java applet? Well, I think if you just look back at the claim, you start with an executable applet and then you must associate with it two constituent systems. During the prosecution history, it was acknowledged that the Johnson reference did not have the data. So an executable applet with the particular data system was not found in Johnson. That was the main argument by the examiner. Not only that, but it also didn't have the second constituent system or further constituent system which allows you to perform operations on that data. If you don't have the data, how can you have something that can perform operations on it? All the prior art was, was just an executable applet. What I think is kind of missed when you're reading through the patent is when you're looking at this, in the prior art, you would send an applet, the client device would receive it, and then execute it. Once it was executed, and this is discussed in column six, at the beginning, starting at line seven, it talks about the client device would receive the applet, execute it, then try and go and get everything it needs. What, what the invention is here is that everything must be on the client device before it is executed. So once it is executed, you can probably disconnect from the network and perform operations on the client device. And unless you're having updatable data, you're not going to need to go back to the server. So the point of execution is very important. Because the prior art, you would execute, and the applet would have to go back to the server and get everything. In this case, with the defendants, you can't execute the applet until it has not only the applet, but the two constituent systems. So it doesn't need to initially go back to the server to get anything to be useful. So that's an important distinction. Now, they also point, claim that the generation must be at the server. But again, if you look at the claims, it says by the server, not at the server, by the server. And that's an important distinction. Because if you look at column, if you look at column nine, around line 43, it says the applet may be generated either directly by the web server, or by an executable external program utilized by the web server application. So it's saying that the web server itself can use other things to generate itself, to generate this applet. So it's not at the server. The claim specifically says by the server. And notably, this is one distinction between claim one and 17 on the dynamically generated terms. The dynamically generated term in claim 17 does not even use the term by the server. So it's silent in that respect. Now, furthermore, that limiting generating to combining, or constructing at the server by combining, in fact, there's nowhere in the patent that uses constructed and combining with itself, but together. But if you look at trying to limit generating to combining, you got to turn to column 12, line 11, which states the applet may be generated in a variety of ways. A variety of ways, not one, a variety of ways. The applet may be generated by combining various predefined units together based on the data storage system. So that's one. Generating does include combining. Then it continues. The applet may also be generated by using templates which are customized based on the data to be included in the data storage system. So to say that generation is limited to combining clearly reads out that generation includes combining, but it's not limited to it. It talks about using it. It does talk about, in other places, about, at least one place about bundling and construction. As we propose, generated is really the proper term to use. Generated by the server. It's readily understandable. There's no need to go back and try to figure out, well, the patent lists many ways that things can be generated, and we're going to pick combining. The patent is much broader than combining. So we think that what the court should do is adopt parallel networks construction, which is generated by the server to have particular services and data for the client based on requests. That's for claim one. And then for claim 17, it's just generating to have data requests. Mr. Bennett, I wanted to let you get through that, but I also want to ask you about something, and that is parallel complains that it's the victim of manifest injustice by the court, by the district court, because of the early Markman hearing, which is called a unique procedure. It's not that unique. Parallel was fully engaged in that collaborative process that led to the district court's decision to conduct the early Markman, wasn't it? It was, in fact, involved in it. There were some issues as to the amount of time that Parallel Networks believes it was involved in it. It made the proposal, and defendants also made proposals that allowed Parallel Networks sufficient time for discovery. And the court set its own schedule. It was not challenged after our initial proposal. And you get to whether a single file is part of the construction or not part of the construction. And what I think is important here is that we're not asking the court here to weigh the factors on the Rule 59 issue. We believe the court did not address one of the factors, the manifest injustice, and also did not consider whether Parallel Networks should be granted leave to address that is an abuse of discretion. It doesn't matter what you would find based on the facts that are underlying. And the Fifth Circuit has stated that. It has said that it needs a meaningful review in order to consider these things on appeal, and that it was not willing to enter the discretionary area which the law consigns to the trial judge. And therefore, if a factor is not considered, it sends it back. And this is the case of Johnson versus Georgia Highway Express, 488 F. 2nd 714 at 720, which is Fifth Circuit 1974. Before your time runs out, let me just ask you a quick sort of housekeeping question that goes back to exactly where you started, which is I think you said when you started that the dynamically generated term is what resulted in the summary judgment here. Is it clear, therefore, that if we were hypothetically to agree with the district court's construction of that term, that would be the only claim construction issue that we would get to in this case? I understand you've got the 59E issue that presumably would want us to address as well. But am I right that the only real claim construction issue that we would need to address in this case to resolve the summary judgment would be that one? To resolve the summary judgment, we still believe that even if you were to adopt the the court properly didn't analyze summary judgment. But if you're talking about the only claim construction issue, the executable applet term, there are still 25 defendants who were severed off this case who were sitting, stayed in the district court waiting for this appeal to come down and continue with the case. They were denied summary judgment. So what we believe is that although it's discretionary for you to address the executable applet issue, we believe you probably should because that issue will directly come up when you're sent back down to the district court in handling additional 25 defendants regardless of whether the results of this appeal. Okay. Let me reserve your full rebuttal time and we'll hear from Mr. McKeon. Good morning. May it please the court. Start with the dynamically generated claim language and the claim construction issue. And I think to do that, it's important to remember that we have to consider the language that's under focus in the context of the entire claim. And when we do that, really, we see a claim that's got some bookends. At one end, we have a server that receives a request from a client. And in response to that request, it collects a series of data items. Then we have the dynamically generated executable applet. And that is done by the server in response to the request that was sent from the client device. And then we had the two constituent systems. And the claim uses the words constituent. They're part of the applet. And in one of them, we have the data items. And the claim specifically says the data items are in the applet. And then we have, of course, the functionality that's associated, that's tied specifically to the data. And finally, at the other end, we've got sending the applet, one we just generated, sending the applet back down to the client device. And the key to this invention, the key is that we're tying the functionality specifically to the data within this applet that's dynamically generated. So when we get to the client device, we have everything we need. We don't need to go back and forth. And this is described really in a detailed description of the invention from column three through the bottom of column seven up to the top of column eight. What they tell you is what not to do. Speaking of that, though, can you turn to then quickly column 12 and the portion of that that was cited by your friend on the other side with regard to the... So he says, presumably, that the provision that says that it may be generated in a variety of ways kind of responds or rebuts the argument you're making thus, right? I mean, I think that's his point. And what's your answer? Right. Well, the answer is it certainly can be generated in a variety of ways, but the key is the combining. The fact that you have templates that help you collect the data and ultimately use the data doesn't mean that you don't have the combination. The combination is the key because remember, if you look at the top of column eight, this is not a typical Java applet, getting to Judge Bryson's point. This is not a typical Java applet. This is an applet that is an augmented Java applet, and the specification describes a unique construction, column 11, all right? And the reason it's unique and it's not typical is because you have this combination of the data and the functionality. So you're saying that the combination and the generating in a variety of creation and generation of the applet itself, which has to comply with, as you see it, the functionality, data, single package, completely executable in and of itself, set off to do its work without the need for a link back to any other source. That's correct. And is that reinforced by the lines that Christine, the ones that your friend pointed out, where it talks about bundling? Absolutely, Ron. They use the word bundle. Later in the specification, it talks about packaging. It uses the term that we're bringing this all together. And it's very difficult to read the specification and not conclude with all these statements that we're not bundling packaging and creating this augmented Java applet. And if there's any ambiguity on the point, we have a very stark example between the traditional web browsing method and the method of the present invention. We're talking about the vending machine. And what happens in the vending machine example is when they talk about the traditional method, they go down with an HTML page to the client device. And they say, hey, we've got to go back and get the plugin over the low speed connection that we have. And we don't want to do that. That's a traditional method. The method of the present invention, we've got it all there. It's all within the applet. So when we get down to the client device, and that's all described in column 10, you've got everything you need. No need to go back. And that's the key to the invention. Again, with respect to the description throughout the specification, what not to do from column three to column eight. They don't want to do that. And this notion of going back, which really is their infringement theory, of course. There is going back, I guess, in the invention in the updatable function that's displayed, for example, on figure three. But I take it your point is that, well, that is after you have sent the full operative executable applet downstream to the client. You may update if you like, or maybe not. But that all is icing on the cake. The cake being, I take it, this single operative, no further consultation, no further communication required applet. Is that... That's absolutely correct. Even figure three, if you go through the step of figure three, you talk about sending the applet, and then actually executing the applet, and then coming back with the updatable element. And when you look at the updatable data element point, it's described in connection with the online bookstore. And in that situation, it's clear from the setup, and we even put in the functionality, and we put in the placeholders for our updatable data element. So when the whole package is sent down, if there's a need to go through the updatable data element, we can go back and just get the very specific data that we need. So that was the improvement over the prior art. In effect, in the summary judgment context in this case, they really are accusing of what's described in column six, and what not to do, which is in the summary judgment context, and when the report was looking at, it was undisputed that there was only three load sequences. It's undisputed that in every one of the load sequences, we got down to the client device, and we didn't have either data, the functionality, or both. And based on the record, based on that record that was created, and remember that all the evidence they put into the summary judgment record was evidence from the viewpoint of the client. There was no evidence from the viewpoint of the server. Of course, this whole thing is about what's going on at the server. So from the viewpoint of the client device, undisputed that we had the three load sequences, and clearly did not satisfy the claim limitation of combining at the server in response to the request the necessary data and the required functionality. And that's really the key to what you mentioned. Now, I do want to address a couple of points that was raised. And you want to address the point, the argument made that under Fifth Circuit law, under 59, it has to go back to the district court to address the manifest injustice. Well, I think I disagree with the premise of the question. I mean, Judge Davis clearly set out the standard requiring all three elements, all three elements of the test, no intervening change in law, no new evidence, and no manifest injustice. Judge Davis sets this out in his order, and he disposes of them. Now, he didn't specifically discuss in detail manifest injustice in the discussion later on, but he clearly was aware of the standard. He set out the standard and emphasized the standard in his opinion and disposed factually of the issues that they were raising and how they didn't meet the standard. So I disagree that he didn't address it in the case, set forth the standard. And of course, this court reviews the judgments, not necessarily the precise wording of the district court. It clearly was something that was before the court, and he was well aware of the standard. And the Rule 59 issue really is just a mulligan. I mean, they were aware, they want a mulligan on this. They were aware of the process. They were part of it. They sued over 120 defendants in four different cases on the same patent, on the same claims, on the same legal theories, and Chief Judge Davis sort of had to deal with that. And the way he dealt with it was this process, which was fully agreed upon by the parties. There was no objection to the process. They were entitled to get discovery, the opportunity to get discovery, and went into this eyes wide open. And in the end of the day, they failed to meet their burden of some of the descriptions in, I think you referred to Column 6, of what the patent, what the invention does not cover as giving us guidance as to what it does cover. Over on Column 7, I was struggling with the description of the Java applet as being one of the, obviously, prior art, and therefore not the invention. Can you flesh out the rather brief description of the Java applet that's given in the patent here, either that or translated for me, in a way that explains what the difference is between the operation of the Java applet and the operation of the invention as you understand the invention? Well, as I understand it, Your Honor, in Column 6, they talk about the traditional Java applet. Right. And the problem with that is you have to go back to get the data. You didn't have the data in that Java applet. Now, you have no data at all. All you're sending forward initially is the functionality, right? That's as described in this specification. And then the client makes a request by either by clicking on a link or whatever for some subset of all available data, and then that gets sent over. Is that correct? That's correct. You have to go back over the link, as they describe it, the lowest speed link, and they're trying to solve this issue of not going over that link. And if you read, you know, to me, the transition language is very informative from the bottom of 7 to 8, where they say, Java applets are better than plug-ins because they help do something on the memory issue, but there's still no good because of this. The concept is we have to go back over the lowest speed link. When you say the memory issue, you mean they're not sitting there forever? That's correct. On the little bitty PDF? Well, the premise is that they are able to deal with multiple different kinds of applications. Oh, I see. Specific plug-ins. The plug-in would just be a one-use, only have one use. That's correct. And therefore would hog a huge amount of memory. With all the different things you need. So the Java app was a little better from that point of view, but it still was a problem, as they describe in the specification, because you had to do this back and forth. Multiple trips. And that's why when they go to the top of column 8, when they talk about the present invention, augmented Java applet. And they go on, not a typical applet, unique construction. This is the language that you see throughout the specification, and with the idea that we're bundling, we're packaging, very critical to the invention. And what they want in construction here, obviously, is to break that up. That you don't require the combination of the server, and then we can go back and forth without ever actually creating the applet at all. That's their position, in effect, is that you don't even need to create the applet, because it's certainly never done on the server. That's their position. And even in the record that we have in this case, it's not even clear that it's ever done on the client. Because you come back, you have to go back and get these additional loads. And at that point, it goes into a web browser, and the functionality continues from there. Now, with respect to the... Give me a moment here, I want to make sure I address... While you're looking at this, either if you can address now or shortly, the question of whether we should address other claim limitations. We focused on... Well, I guess we principally focused on dynamically generated, perhaps with some secondary focus on executable applet. That's right. I think that's... Just as part of that, before you say... You offer executable applet an argument. I mean, you contest what the district court did too. We do. And you offer that as an alternative... We do. ...to the dynamic, not in addition to the dynamic, right? It's an alternative grounds, we believe, for affirmance. If the court was to disagree with the appellees on the issue of dynamically generated and the grand summary judgment based on that, we offer these are two additional issues on claim construction and related summary judgment on executable applet and... Let's assume an affirmance on summary judgment based on the dynamically generated. If there's an affirmance, then I think this court is done and there's remaining defendants that are in the district court below. Now, the court in the past has gone on to deal with additional constructions that are in the record. And I think there may be some efficiency for the court to do that in this case based on the fact that we have a case below with 25 or so defendants that would, of course, be looking at whatever the court says here. Presumably, we can't... We're not going to run rapid and decide other kind of inspection questions other than, I guess, the one that at least has been briefed before us, which is the executable applet. That's correct, Your Honor. There's actually two executable applet and data interface capability, but it's related conceptually. This may be just as... Perhaps this is just a technical point, but just for clarification, help me. It seems to me that dynamically generated doesn't really carry all the water that you're asking that term to carry. It would seem to me you really need the whole phrase executable applet dynamically generated to speak to what you view as the restrictive nature of this invention. Now, correct me if I'm... I think you can't really talk about dynamically generated without asking the question, what are you dynamically generating? What's important is that's an executable applet. That means ready to go and hit it around running, right? That's actually right. It's really not just dynamically generated that you're focusing on. Well, again, going back to my original statement, we've got to look at the whole claim certainly in context. Even Parallels Construction in this court says they want the court to construe dynamically generated with particular data and services. They recognize that what we're generating is part of the question of dynamically generated, the language. Obviously, looking at it as a whole, I think gives you a better picture of what's going on and I think it informs the construction. But the way it was presented below was breaking it up. But I do think certainly that the dynamically generated language at the court construed is fully supportable. And as we've got prosecution history, as the court knows, we've cited that in addition we support the course construction, the rejection of the Johnson reference, and the idea that we're doing this at the time of and in response to the request, which we believe that the prosecution history at A998 further supports Judge Davis and he even cites that himself. Thank you. Thank you. And Mr. Bennett, you have, well, we'll give you your full three minutes. Thank you, Your Honor. What I want to point out is that Mr. McKeon was very good at looking at particular points in the specification, not looking at the whole specification. He didn't address the claim differentiation where if the patentee in Claim 1 had wanted the applet to comprise two portions, he would have used that language like he did in Column 11, how the patent says you have two constituent systems associated with the applet or you can have the applet comprising two portions. Those things are all part of the specification. They have to be considered by the court here. And he pointed out in figure, I think Your Honor pointed to figure three, and he said, well, we can't infringe that. Well, let's look at figure three. There's no dispute that they cannot execute the applet before they have the applet and all constituent systems. So that's 54, transmit the applet. Everything's transmitted there. You can't go to 56 until you have everything. There's no dispute on that. So all their systems, which require the client device to have everything before it's executed, fit within figure three. Now, Your Honor asked about Java applets and said, well, Java is a little bit... But I take it that in the accused device, there's something that happens between 54 and 56. Not with respect to the applet. The applet is not... Not with respect to the obtaining of data, right? You can't execute the applet in the sense of making the functionality operate on the data if you don't have any data. You're not even running the code. It is sitting on the client device. The way this is sent is it's sent in HTML, which is a markup language. It's not a program language. You read through. It says, okay, I have, for example, the one where the data and it gets... What do we mean by execute? Maybe I'm operating on a misapprehension here. When you say execute the applet, what do you mean exactly? It has to be a program that is actually executed. It's doing what the program is intended to do, right? In your case, it's ordering a Pepsi or it's asking for information about a book, right? That's what the applet does in your examples, in your path. Yes. Right. But if the accused devices do not have data in the applet that arrives from the server to the client until the client requests the data through another communication via a link or whatever, then there's something... It would not be able to execute. The applet would not be able to execute its function without an intervening step of obtaining data, correct? Well, the applet couldn't execute, period. If it tried to execute before it had the data, there would be... Right. So if we look at this and we interpret figure three as going from transmission to execution without an intervening step of obtaining data, then it would not read on the accused devices, isn't that correct? Well, if you're asking about not an intervening step, but I think when you're talking about claims, as long as you have the elements, you could have a lot more in there. And if you look at the... So what you're saying, this is where I began, and I think I understand what you're saying, but I think you're saying that in between 54 and 56, setting aside the material coming from 60, which is downstream, between 54 and 56, it is possible and in the accused devices, it is in fact necessary to do something else, which is obtain data. In some situations. In some situations, it does the functionality. And if I may make one more point, which I think is relevant, is that the claim itself says a request, which can mean one or more, and also the last element is the applet is operable to be transferred, transferable. Broad language can be transferred. It doesn't say how or where. They're trying to read it in to the dynamically generated claim, and we think that's improper and the specification is broader than that. Thank you, Your Honor. Thank you, Mr. Bennett. We thank both counsel. The case is submitted. All rise.